UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                                      CASE NO.  8:11-cr-269-T-23AEP
                                                                            8:14-cv-3113-T-23AEP

JERRY ALAN BOTTORFF
_____/


UNITED STATES OF AMERICA

v.                                                      CASE NO.  8:11-cr-269-T-23AEP
                                                                            8:14-cv-3184-T-23AEP

CRISTIE FAY BOTTORFF
_____/


**O R D E R**

Jerry Alan Bottorff and Cristie Fay Bottorff married after successfully hiring

another to murder her then- husband, after which she claimed proceeds of a million-

dollar-life-insurance policy.  The couple were both arrested nearly four years after

the murder and indicted for (1) use of interstate commerce facilities in the

commission of a murder-for-hire, (2) conspiracy to use interstate commerce facilities

in the commission of a murder-for-hire, and (3) aiding or abetting carrying or using a

firearm that resulted in death.  The Bottorffs faced the possibility of the death

penalty, but a year after the indictments the Attorney General disapproved seeking a

sentence of death.  (Doc. 125 in 8:11-cr-269-T-23AEP)  Approximately two weeks

later the Bottorffs pleaded guilty without a plea agreement, were sentenced to life

imprisonment, unsuccessfully appealed, and filed identical motions to vacate under

28 U.S.C. § 2255.  The motions to vacate, which allege that counsel rendered

ineffective assistance, lack merit.

## FACTS

The Bottorffs hired a gang member as an intermediary to retain someone to

murder Cristie's then-husband, Thomas Sehorne.  The Department of Justice

disallowed pursuing the death penalty.  On the morning of the scheduled trial the

Bottorffs decided to plead guilty and cooperate with the United States in the hope of

reducing their sentences.  Both Bottorffs faced a statutory mandatory minimum

sentence of life imprisonment unless the United States moved under Section 5K1.1

for a reduced sentence as authorized by the Sentencing Guidelines.

The prosecutor recited the following facts when the Bottorffs pleaded guilty

(Doc. 279 at 29–31):

> Judge, in the early morning hours of June 7, 2007, Thomas Lee
> Sehorne was shot and killed in the carport of his home in
> eastern Hillsborough County. The killing was the result of an
> agreement between Jerry Bottorff (a friend of Mr. Sehorne),
> Mr. Sehorne's wife (now Mrs. Bottorff before you), Michael
> Garcia, and Luis Lopez.
>
> Several months before the shooting, Mr. Bottorff approached
> Mr. Garcia about this matter. They had discussions about it.
> Ultimately they discussed it with Cristie Sehorne at the time
> (now Cristie Bottorff). Money was offered in the amount of
> $60,000 that would be paid from insurance policies.
>
> Mr. Garcia was a high-ranking member — a former high-
> ranking member of the Latin Kings street gang. Luis Lopez was

a person he knew that was part of the street gang. It was a friend of his. He talked to Luis Lopez about this and Mr. Lopez offered to do the job. There were numerous telephone calls between the various parties in setting up this murder. The mails were used extensively in the pursuit of the money as a consequence of this murder from insurance companies, either mails and telephone, either Mrs. Sehorne (now Ms. Bottorff) at the time and/or lawyers on her behalf trying to get the money. Ultimately, Mr. Garcia was arrested. He agreed to cooperate. He made a series of phone calls to Mr. Bottorff and spoke with Mrs. Bottorff, by now, on the phone on several occasions and also in person.

There were agreements that they would come and start to repay this debt that was outstanding in the amount of $60,000, and on three occasions thinking they were paying the money to friends of Mr. Garcia, who would in turn take the money to Mr. Lopez and/or members of the Latin Kings street gang. Mr. Bottorff and Ms. Bottorff went to a McDonald's restaurant over in the eastern part of the county. Mr. Bottorff got out of the car and met with the undercover officers — and actually there is one in 2009, one in 2010, one in 2011 — met with them and paid them $6,000 in receipt for the homicide. There were discussions on the phone about how much money was still owed and the like.

So, you have the use of interstate commerce facilities extensively before, during and after. A firearm was used, a firearm was ultimately recovered, a .38 caliber firearm, two slugs were taken out of Mr. Sehorne.

The Bottorffs agreed to the accuracy of the facts when they pleaded guilty

(Doc. 279 at 31–32):

THE COURT: All right. Mr. and Mrs. Bottorff, did you hear the facts as stated by the prosecutor?

MR. BOTTORFF: Yes, sir.

MRS. BOTTORFF: Yes.

THE COURT: Do you have any disagreement with any of those facts?

MR. BOTTORFF: No, sir.

MRS. BOTTORFF: No.

THE COURT: Are those facts true?

MR. BOTTORFF: Yes, sir.

MRS. BOTTORFF: Yes.

THE COURT: Did you each agree with Mr. Garcia and Mr.
Lopez to have Mr. Sehorne killed and that Mr. Garcia and Mr.
Lopez would receive $60,000 in U.S. currency for the killing of
Mr. Sehorne?

MR. BOTTORFF: The agreement was with Michael Garcia,
not with Mr. Lopez.

THE COURT: All right. Mrs. Bottorff?

MRS. BOTTORFF: Same.

THE COURT: All right. So you agreed with Mr. Garcia that he
would be paid money to facilitate the killing of Mr. Sehorne?

MR. BOTTORFF: Yes, sir.

THE COURT: Mrs. Bottorff?

MRS. BOTTORFF: Yes.

Additionally, the Bottorffs accepted the factual accuracy of their respective

presentence report.  (Docs. 277 at 4 and 281 at 4)  The United States' evidence

against the Bottorffs included statements by Michael Garcia (the individual they

hired to arrange for Mr. Sehorne's murder) implicating the Bottorffs and the

testimony of undercover police officers who met with the Bottorff's during the

investigation.

Absent extraordinary circumstances, the above facts bind both defendants.

"[T]he representations of the defendant . . . [at the plea proceeding] as well as any

findings made by the judge accepting the plea, constitute a formidable barrier in any

subsequent collateral proceedings.  Solemn declarations in open court carry a strong

presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 73–74 (1977).

The Bottorffs cooperated and, as hoped, the United States moved for a

two-level reduction under Section 5K1.1.  Nevertheless, both defendants were

sentenced to life imprisonment.  Upon reconsideration of the sentences, the district

court again explained why both defendants earned life imprisonment (Doc. 242

at 2–3):

> As stated at the sentencing, I considered at length — both
> before and during the sentencing — the proper sentence,
> assuming the extraordinary history of, and the law applicable
> to, this case. Nonetheless, each defendant requests
> reconsideration of the sentence (already considered and
> reconsidered more than once). From an awareness of the
> gravity of each sentence and the consequences to each
> defendant and from a regard for the considered request of each
> counsel, I have again reconsidered the sentences and again
> reviewed the entirety of the available material.
> . . . .
>
> Again, I conclude that, assessed under Section 3553(a), the
> attributes of the offense and these offenders — the startling
> coldness and moral detachment of the Bottorffs as they
> contemplated and executed this atrocity over many weeks and
> afterward until apprehension, the necessity for an unalloyed
> message to those who would contemplate a similar offense, the
> necessity to protect the community from this species of criminal
> adventure, and the other reasons stated at the sentencing —
> strongly commend the announced sentence, even after careful
> consideration and reconsideration of the sundry matters to
> which the defense directs by attention.
>
> To secure the proceeds of a million dollar life insurance policy
> and rid themselves of Cristie Bottorff's inconvenient and
> unwanted husband, the Bottorffs conceived and executed a
> murder-for-hire that resulted in the bloody ambush of Thomas

Lee Sehorne in his driveway by a nineteen-year-old whose amateurish services were procured by a former gang member and current thug, selected by the Bottorffs precisely owing to his gang history and his notorious thuggishness. Cristie Bottorff's murdered husband lay for hours in his driveway, near his car, in a pool of blood, and in an army of insects until discovered after daylight by his six-year-old son. Through this and during the coming months, the Bottorffs focused on the pursuit of money and the comfortable living of their daily lives unburdened by Cristie Bottorff's husband. In sum, my reconsideration of the Bottorffs' life sentence has reinforced my commitment to the necessity of the sentence. The only doubt that lingers after reconsideration of the Bottorffs' crime arises while trying to imagine the Department of Justice's justification in forbearing the death penalty. Whatever the justification, the Bottorffs should be thankful for the Department's puzzling and unbought gift.

First, the appellate court accurately describes the sentences of life imprisonment as "the district court [having] actually granted the government's substantial assistance motion pursuant to United States Sentencing Guidelines § 5K1.1, departed downward, and then imposed an upward variance." (Docs. 343 at 2 and 344 at 2–3) Second, the appellate court held that the Bottorffs proved that their respective sentence was neither procedurally nor substantively unreasonable.

## GUILTY PLEA

*Tollett v. Henderson*, 411 U.S. 258, 267 (1973), holds that a guilty plea waives a non-jurisdictional defect:

[A] guilty plea represents a break in the chain of events which has preceded it in the criminal process. When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea.

- 6 -

This waiver of rights precludes most challenges to the conviction. "[W]hen the judgment of conviction upon a guilty plea has become final and the offender seeks to reopen the proceeding, the inquiry is ordinarily confined to whether the underlying plea was both counseled and voluntary." *United States v. Broce*, 488 U.S. 563, 569 (1989). *See also United States v. Patti*, 337 F.3d 1217, 1320 (11th Cir. 2003) ("Generally, a voluntary, unconditional guilty plea waives all non-jurisdictional defects in the proceedings."), and *Wilson v. United States*, 962 F.2d 996, 997 (11th Cir. 1992) ("A defendant who enters a plea of guilty waives all non-jurisdictional challenges to the constitutionality of the conviction, and only an attack on the voluntary and knowing nature of the plea can be sustained."). A guilty plea waives a claim based on a pre-plea event, including a claim of ineffective assistance of counsel. *Wilson*, 962 F.2d at 997. Consequently, the entry of a guilty plea waives a claim (other than a jurisdictional challenge or a challenge to the voluntariness of the plea), including both a substantive claim and a purported failing of counsel that occurred before entry of the plea.

A plea waives both known and unknown challenges to the proceedings. *Brady v. United States*, 397 U.S. 742, 757 (1970) ("A defendant is not entitled to withdraw his plea merely because he discovers long after the plea has been accepted that his calculus misapprehended the quality of the State's case or the likely penalties attached to alternative courses of action. More particularly, absent misrepresentation or other impermissible conduct by state agents . . . a voluntary plea of guilty

intelligently made in the light of the then applicable law does not become vulnerable because later judicial decisions indicate that the plea rested on a faulty premise."). *See also McMann v. Richardson*, 397 U.S. 759, 766 (1970) (holding that a plea waives the right to trial and, therefore, waives the "right to contest the admissibility of any evidence the State might have offered against the defendant").

## <u>INEFFECTIVE ASSISTANCE OF COUNSEL</u>

Bottorff claims ineffective assistance of counsel, a difficult claim to sustain. "[T]he cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between." *Waters v. Thomas*, 46 F.3d 1506, 1511 (11th Cir. 1995) (*en banc*) (*quoting Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994)).  As *Sims v. Singletary*, 155 F.3d 1297, 1305 (11th Cir. 1998), explains, *Strickland v. Washington*, 466 U.S. 668 (1984), governs an ineffective assistance of counsel claim:

> The law regarding ineffective assistance of counsel claims is
> well settled and well documented. In *Strickland v. Washington*,
> 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the
> Supreme Court set forth a two-part test for analyzing ineffective
> assistance of counsel claims. According to *Strickland*, first, the
> defendant must show that counsel's performance was deficient.
> This requires showing that counsel made errors so serious that
> counsel was not functioning as the "counsel" guaranteed the
> defendant by the Sixth Amendment. Second, the defendant
> must show that the deficient performance prejudiced the
> defense. This requires showing that counsel's errors were so
> serious as to deprive the defendant of a fair trial, a trial whose
> result is reliable.  *Strickland*, 466 U.S. at 687, 104 S. Ct. 2052.

*Strickland* requires proof of both deficient performance and consequent prejudice. *Strickland*, 466 U.S. at 697 ("There is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one."); *Sims*, 155 F.3d at 1305 ("When applying *Strickland*, we are free to dispose of ineffectiveness claims on either of its two grounds."). "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." 466 U.S. at 690. *Strickland* requires that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." 466 U.S. at 690.

Bottorff must demonstrate that counsel's alleged error prejudiced the defense because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." 466 U.S. at 691–92. To meet this burden, Bottorff must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694.

*Strickland* cautions that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." 466 U.S. at 690–91. Bottorff cannot meet his burden merely by showing that the avenue chosen by counsel proved unsuccessful.

> The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial . . . . We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.

*White v. Singletary*, 972 F.2d 1218, 1220–21 (11th Cir. 1992). *Accord Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) ("To state the obvious:  the trial lawyers, in every case, could have done something more or something different. So, omissions are inevitable . . . . [T]he issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'") (*en banc*) (*quoting Burger v. Kemp*, 483 U.S. 776, 794 (1987)). *See also Jones v. Barnes*, 463 U.S. 745, 751 (1983) (counsel has no duty to raise a frivolous claim).

## GROUNDS FOR RELIEF

As stated at the outset, both defendants filed a motion to vacate and a supporting memorandum. The grounds for relief are addressed together because the same grounds are alleged in both motions to vacate and supporting memoranda.

## Ground One

The Bottorffs allege that their trial counsel "ambushed" them on the morning of trial and coerced them into pleading guilty because counsel were unprepared for trial, contrary to the earlier assurances of "an outstanding chance of acquittal of all charges." (Jerry Bottorff, Doc. 2 at 26; Cristie Bottorff, Doc. 2 at 19)  The Bottorffs complain that counsel neither investigated the case nor discussed the government-provided discovery material nor filed pre-trial motions nor acquired a written plea agreement.  The Bottorffs assert that neither of them would have pleaded guilty "if they ever believed or anticipated even a shred of a chance that they could get life in prison." (Jerry Bottorff, Doc. 2 at 30; Cristie Bottorff, Doc. 2 at 23)

The record shows that the Bottorffs pleaded guilty without declaring counsels' now-alleged pretrial failings (Doc. 279 at 13–15):

> THE COURT: I'll ask each of you again, do you feel that you understand those charges against you in each of the counts of the Indictment — Superseding Indictment?
>
> MR. BOTTORFF: Yes.
>
> MRS. BOTTORFF: Yes.
>
> THE COURT: Do you feel that you have had a full and fair opportunity to review all the facts and evidence in your case in consultation with your attorney about each of these charges?
>
> MR. BOTTORFF: Yes, Your Honor.
>
> MRS. BOTTORFF: Yes.
>
> THE COURT: Have you discussed with your attorney all your options in your case, to specifically include your option to take your case to trial?

MR. BOTTORFF: Yes.

MRS. BOTTORFF: Yes.

THE COURT: And after discussing those options, are you satisfied with your decision to enter a plea of guilt in this case without the benefit of a plea agreement?

MR. BOTTORFF: I'm sorry, can you repeat that?

THE COURT: In other words, what I'm asking you, are you satisfied with your decision to plead guilty without the benefit of a plea agreement in this case?

MR. BOTTORFF: Yes, sir.

THE COURT: Ms. Bottorff, are you satisfied with your decision to plead guilty in your case without the benefit of a plea agreement?

MRS. BOTTORFF: Yes.

THE COURT: Has your attorney done everything that you have asked him to do for you in your case?

MR. BOTTORFF: Yes.

MRS. BOTTORFF: Yes.

THE COURT: Do you feel your attorney has done anything in an unsatisfactory manner?

MR. BOTTORFF: No, sir.

MRS. BOTTORFF: No.

THE COURT: Are you fully satisfied with the advice and representation that you have received in your case?

MR. BOTTORFF: Yes.

MRS. BOTTORFF: Yes.

THE COURT: All right. Mr. Furr, was there a plea agreement tendered in this case?

- 12 -

MR. FURR: No, sir.

THE COURT: All right. Thank you. Let me ask each of you, has anyone forced you or threatened you in any way, or anyone you may know for that matter, in order to induce you to plead guilty in your case?

MR. BOTTORFF: No, sir.

MRS. BOTTORFF: No.

THE COURT: Has anyone promised you anything of value in order for you to plead guilty in your case?

MR. BOTTORFF: No, sir.

THE COURT: Mr. Louderback, are you aware of any promises in this matter?

MR. LOUDERBACK: No.

THE COURT: Mr. Hernandez, any promises that you are aware of?

MR. HERNANDEZ: No, Your Honor.

THE COURT: Mr. Furr, are you aware of any promises?

MR. FURR: There are none.

The Bottorffs pleaded guilty with a full understanding that they faced a

mandatory term of life imprisonment (Doc. 279 at 17):

THE COURT: I realize given the significance of these penalties that are associated with each of these charges this difficult decision has been imposed upon you. But again I want to emphasize to you that Counts One and Two carry with it a term of imprisonment of a mandatory term of life. Do you each understand that?

MR. BOTTORFF: Yes.

THE COURT: Do you understand that, Ms. Bottorff?

MRS. BOTTORFF: Yes.

The only hope the Bottorffs had of possibly avoiding a mandatory sentence of life imprisonment was to cooperate and the United States decide that their assistance was substantial (Doc. 279 at 18–19):

THE COURT: It's your decision whether to cooperate with the government. If you do decide to cooperate with the government, you need to understand that there are certain things that the Court would take into consideration. Specifically, what you need to understand is that it's within the government's sole discretion whether to consider your cooperation and to file a motion on your behalf.

So let me give you an example. If you do cooperate with the government and the government does not file a motion on your behalf asking the Court to reduce your sentence, you cannot later complain and ask to withdraw from your plea of guilt. Specifically, because as you have already articulated, there is no agreement with the government whether you can cooperate or not.

Additionally, even if the government does file a motion on your behalf requesting a reduction in your sentence based upon any cooperation, you need to understand that the Court does not have to grant that motion. And if the Court does not grant the motion you cannot later complain and ask to withdraw from your plea of guilt. Do you each understand that?

MR. BOTTORFF: Yes.

MRS. BOTTORFF: Yes.

THE COURT: Do you have any questions about that?

MR. BOTTORFF: No, sir.

MRS. BOTTORFF: No.

Lastly, because no right to a plea agreement exists the Bottorffs complaint that their counsel failed to secure a written plea agreement lacks merit. *Weatherford v. Bursey*, 429 U.S. 545, 561 (1977) ("[T]here is no constitutional right to plea bargain."); *Missouri v. Frye*, 132 S. Ct. 1399, 1410 (2012) ("[A] defendant has no right to be offered a plea, *see Weatherford*, 429 U.S., at 561 . . . nor a federal right that the judge accept it, *Santobello v. New York*, 404 U.S. 257, 262, 92 S. Ct. 495, 30 L. Ed. 2d 427 (1971)."). Moreover, even if the Bottorffs counsel had requested a written plea agreement, the United States had the discretion to reject the request. *United States v. Palmer*, 809 F.2d 1504, 1508 (11th Cir. 1987) ("A myriad of factors enter into plea bargaining decisions, and the decision to reject a proposed deal is entirely within the prosecutor's discretion.").

The Bottorffs pleaded guilty soon after the possibility of the death penalty was removed. Their only hope of avoiding life imprisonment was to plead guilty and cooperate. As discussed above, their pleas waived the present complaints about their counsel. Their representations when they pleaded guilty belie the contrary assertions in their present papers.[1]

---

[1] Perhaps unwittingly, the Bottorffs speak the truth when in ground three (a waived Fourth Amendment challenge to the warrantless seizure of property) they say that "consensual telephone calls between Garcia and the Bottorffs . . . eviscerated the defense. These unlawfully seized records were instrumental in convincing the Bottorffs to plead guilty." Jerry Bottorff (Doc. 2 at 49–50); Cristie Bottorff (Doc. 2 at 42–43)

- 15 -

**Ground Two**

The Bottorffs allege that the United States breached the plea agreement and that their counsel failed to object to the violation.  The cases that the Bottorffs cite are based on the violation of a written plea agreement, which does not exist in this case.  As shown above, when the Bottorffs pleaded guilty they admitted both the absence of a plea agreement and the absence of either a promise or a threat that caused them to plead guilty.  Both defendants represented that they were "satisfied with [their] decision to plead guilty . . . without the benefit of a plea agreement?" (Doc. 279 at 13–14)

The United States allowed the Bottorffs to cooperate in an attempt to gain a sentence reduction under Section 5K1.1, a motion that the United States later filed in recognition of their substantial assistance.  (Doc. 231 in 8:11-cr-269-T-23AEP)  The Bottorffs were fully advised that the district judge was not required to grant a Section 5K1.1 reduction and that they could not withdraw the guilty plea if a reduction was not granted.  (Doc. 279 at 18)

**Ground Three**

The Bottorffs allege that their Fourth Amendment rights were violated when law enforcement officers seized their cellular telephones and other private property without a warrant.  When the Bottorffs pleaded guilty they admitted they understood that they were waiving their right to challenge the validity of the search (Doc. 279 at 27):

> THE COURT: Let me also explain to you that if you have any objections as to how the charges were brought against you or as to how the evidence was gathered in your case, you are waiving any objections to those matters by entering a plea of guilt. Do you each understand that?
>
> MR. BOTTORFF: Yes, sir.
>
> MRS. BOTTORFF: Yes.

The Bottorffs are precluded from contesting the lack of a search warrant. *McMann v. Richardson*, 397 U.S. 759, 766 (1970) (holding that a plea waives the right to trial and, therefore, waives the "right to contest the admissibility of any evidence the State might have offered against the defendant").

## **Ground Four**

The Bottorffs allege that their counsel rendered ineffective assistance "during the plea process in contravention of *Lafler v. Cooper*[, 132 S. Ct. 1376 (2012)] and *Missouri v. Frye*[, 132 S. Ct. 1399 (2012)]." The Bottorffs contend that "any negotiated plea should have been effectuated in writing, as well as all promises and inducements. Moreover, counsel should have bound the government and [the] court, pursuant to Fed. R. Crim. P. 11(C)(1)(c) with a maximum cap on their sentence, and as to the effects of cooperation, or resolution and disposition of the case." (Jerry Bottorff, Doc. 2 at 52; Cristie Bottorff, Doc. 2 at 45) Neither *Lafler* nor *Frye* applies. As shown above, a plea agreement was never offered to the Bottorffs, and a defendant has no right to require a prosecutor to agree to plea bargain.

**Ground Five**

The Bottorffs allege that they "never aided nor abetted either Garcia or Lopez in the commission of the charged offense," that they "never thought [the murder] would actually happen," that "[t]here is not a scintilla of evidence presented the Bottorffs ever met the shooter Lopez, and it must be emphasized no plan, schedule, or any details of what was to occur were ever discussed," and "[t]here exists not a shred of credible, believable nor logical evidence that the Bottorffs had any notice that Garcia, and Lopez scheduled the killing of Sehorne and had planned the event." (Jerry Bottorff, Doc. 2 at 55–60; Cristie Bottorff, Doc. 2 at 51–53)  As the transcript of the re-arraignment shows, these startling assertions are resoundingly refuted by the incontestible facts.  The Bottorffs conceived and set in motion the events that led to the slaying of Mr. Sehorne, and they had ample opportunity — perhaps during one of the approximately forty conversations with Garcia — to stop the intended outcome if, as they now allege, they did not believe that Garcia would fulfill his end of the contract.  As the district court observed before imposing Jerry Bottorff's sentence, "this defendant procured the services of Mr. Garcia, a many-times convicted felon.  I must say that if I were going to hire somebody to commit a murder that I did not expect to actually commit the murder, I might [hire a choirmaster] at the church or maybe the bus driver on a school bus.  I don't know that I would go out and get a many-times convicted felon who was [late of] a notorious gang noted for its violence.

It's hard, actually, to think of someone more likely to be able to procure a murder than the person contacted here." (Doc. 281 at 17)

**Ground Six**

The Bottorffs allege that "appellate counsel were clearly ineffective." The Bottorffs' trial counsel were also their appellate counsel. The Bottorffs complain that the only issue raised on appeal was the reasonableness of the life sentences, and they contend that "astute and competent counsel would have raised seminal legal and factual issues . . . ." (Jerry Bottorff, Doc. 2 at 63; Cristie Bottorff, Doc. 2 at 56)

*Strickland* governs an ineffective assistance of appellate counsel claim. Proof that appellate counsel omitted an issue on appeal is not proof of deficient performance because counsel need not raise every non-frivolous issue. *Jones v. Barnes*, 463 U.S. 745 (1983); *Eagle v. Linahan*, 279 F.3d 926, 940 (11th Cir. 2001) (*citing Barnes*). An appellate advocate provides effective assistance by winnowing out weaker claims and focusing on the appellate claims most likely to prevail:

> It is difficult to win a *Strickland* claim on the grounds that appellate counsel pressed the wrong legal arguments where the arguments actually pursued were reasonable in the circumstances. We have emphasized that even in a death penalty case, counsel must be "highly selective about the issues to be argued on appeal . . . ." *United States v. Battle*, 163 F.3d 1, 1 (11th Cir. 1998). The district court, having considered the record and [appellate counsel]'s testimony during the state post-conviction proceeding, found that [appellate counsel] had carefully considered many of the claims now raised in appeal, but ultimately chose to pursue the claims he felt were most likely to prevail and winnow out the arguments he thought were less persuasive.

*Johnson v. Alabama*, 256 F.3d 1156, 1188 (11th Cir. 2001), *cert. denied* 535 U.S. 926 (2002).

The Bottorffs complain that, because counsel were ineffective at trial, new counsel was required for the appeal because trial counsel "could not have been expected to raise [the ineffectiveness] issue.  (Jerry Bottorff , Doc. 2 at 64; Cristie Bottorff,  Doc. 2 at 57)  Even new counsel could not assert trial counsel's ineffectiveness because claims of ineffective assistance of trial counsel are not reviewable on direct appeal.  *United States v. Tyndale*, 209 F.3d 1292, 1294 (11th Cir. 2001).

## Ground Seven

The Bottorffs allege that trial counsel were ineffective for not moving for the recusal of the district judge, and the motions to vacate seek the district judge's recusal from ruling on the motions to vacate.  The basis for their belief of bias is the imposition of life sentences and the subsequent refusal to reduce the sentences upon reconsideration.

Recusal is governed by 28 U.S.C. § 455, which requires a judge to "disqualify himself in any proceeding in which his impartiality might reasonably be questioned."  The standard for determining recusal is "whether an objective, disinterested, lay observer fully informed of the facts underlying the grounds on which recusal was sought would entertain a significant doubt about the judge's impartiality."  *United States v. Patti*, 337 F.3d 1317, 1321 (11th Cir. 2003) (citation omitted), *cert. denied*,

540 U.S. 1149 (2004).  The alleged bias must be personal, not simply based on adverse rulings.  "[I]t is well settled that the allegation of bias must show that the bias is personal as distinguished from judicial in nature.  As a result, except where pervasive bias is shown, a judge's rulings in the same or a related case are not a sufficient basis for recusal."  *Bolin v. Story*, 225 F.3d 1234, 1239 (11th Cir. 2000) (citations omitted).  *See also Byrne v. Nezhat*, 261 F.3d 1075, 1103 (11th Cir. 2001) ("[A]dverse rulings alone do not provide a party with a basis for holding that the court's impartiality is in doubt.").

First, because the basis for the district judge's purported bias was the life sentences, trial counsel could not possibly have moved for a recusal before the district judge determined each appropriate sentence.  Second, the sentences are based not on bias but are based on the egregious, cold-blooded facts of two individuals who contracted for the murder of Mr. Sehorne, after which Mrs. Bottorff claimed the proceeds of a million-dollar-life-insurance policy on her late husband.  Moreover, the appellate court held that the Bottorffs failed to prove that their respective sentences were either procedurally or substantively unreasonable.  (Docs. 343 and 344)

Accordingly, the motions under Section 2255 to vacate the sentences (Doc. 1 in 8:14-cv-3113-T-23AEP and Doc. 1 in 8:14-cv-3184-T-23 AEP) are **DENIED**.  The clerk must (1) enter a judgment against Jerry Bottorff in 8:14-cv-3113-T-23AEP and against Cristie Bottorff in 8:14-cv-3184-T-23 AEP and (2) close each case.

### DENIAL OF BOTH A
### CERTIFICATE OF APPEALABILITY
### AND LEAVE TO APPEAL *IN FORMA PAUPERIS*

Bottorff is not entitled to a certificate of appealability ("COA").  A prisoner moving under Section 2255 has no absolute entitlement to appeal a district court's denial of his motion to vacate.  28 U.S.C. § 2253(c)(1).  Rather, a district court must first issue a COA.  Section 2253(c)(2) permits issuing a COA "only if the applicant has made a substantial showing of the denial of a constitutional right."  To merit a certificate of appealability, Bottorff must show that reasonable jurists would find debatable both (1) the merits of the underlying claims and (2) the procedural issues he seeks to raise.  *See* 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 478 (2000); *Eagle v. Linahan*, 279 F.3d 926, 935 (11th Cir 2001).  Because he fails to show that reasonable jurists would debate the merits of the claims, the Bottorffs are entitled to neither a certificate of appealability nor an appeal *in forma pauperis*.

Accordingly, a certificate of appealability is **DENIED**.  Leave to appeal *in forma pauperis* is **DENIED**.  Bottorff must obtain authorization from the circuit court to appeal *in forma pauperis*.

ORDERED in Tampa, Florida, on January 26, 2016.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE